Filed: 4/11/2023 10:14 AM
Michael Gould
District Clerk
Collin County, Texas
By Stacy Denny Deputy
Envelope ID: 74510614

No. 416-01826-2023

| | | |
|---|---|---|
| OCWEN FINANCIAL CORPORATION and PHH MORTGAGE CORPORATION | § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § | |
| v. | § § | COLLIN COUNTY, TEXAS |
| SAMUEL L. BOYD, BOYD & ASSOCIATES, and JEAN-MARC EICHNER | § § § § | |
| *Defendants.* | § § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiffs Ocwen Financial Corporation and PHH Mortgage Corporation, as successor-by-merger to Ocwen Loan Servicing, LLC and Homeward Residential, Inc. (collectively "Ocwen"), file this Original Petition against Defendants Samuel L. Boyd and Boyd & Associates (collectively "Boyd") and Jean-Marc Eichner ("Eichner") as follows:

### I.  DISCOVERY CONTROL PLAN

1.      Ocwen intends to conduct discovery under Level 3.

### II.  CLAIM FOR RELIEF

2.      Pursuant to Texas Rule of Civil Procedure 47(c), Ocwen seeks monetary relief in excess of $1 million.

### III.  PARTIES AND SERVICE

3.      Ocwen Financial Corporation is a Florida corporation with its principal place of business in Florida.

4. PHH Mortgage Corporation is a New Jersey corporation with its principal place of business in New Jersey. PHH is the successor by merger to Ocwen Loan Servicing, LLC and Homeward Residential, Inc.

5. Samuel L. Boyd is an individual residing in Dallas County, Texas who may be served at 3728 Binkley Ave. Dallas, Texas 75205, or anywhere he may be found.

6. Boyd & Associates is a Texas professional corporation with its principal place of business in Dallas County, Texas. Boyd & Associates may be served by serving its registered agent, Samuel L. Boyd, at 6440 North Central Expressway, Suite 600, Dallas, Texas 75206-4101.

7. Jean-Marc Eichner is an individual residing in Collin County, Texas who may be served at 2208 Goliad Circle, Frisco, Texas 75033, or anywhere he may be found.

## IV. JURISDICTION AND VENUE

8. The subject matter in controversy is within the jurisdictional limits of this court. The court has personal jurisdiction over the parties because defendants transact business in this County.

9. Venue is proper in Collin County under Texas Civil Practice & Remedies Code §15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims asserted occurred in Collin County. Venue is also proper in Collin County because one or more of the defendants reside in Collin County. *See* Tex. Civ. Prac. & Rem. Code §§15.002(a)(2) & 15.005. Venue is further proper in Collin County under the venue clause in Paragraph 15 of the Separation Agreement and Full Release between Eichner and Ocwen dated May 10, 2019 (the "Separation Agreement").

## V. FACTUAL BACKGROUND

10.     This lawsuit arises out of concerted action by Boyd and Eichner to cause substantial harm to Ocwen in breach of obligations they owed to Ocwen.  Boyd induced Ocwen to pay $30 million to settle False Claims Act, 31 U.S.C. §3729, *et seq*. (the "FCA"), litigation he initiated and prosecuted against Ocwen by falsely representing to Ocwen that it was buying an end to litigation (the "Fisher Settlement").  But, before the ink was even dry on the Fisher Settlement, Boyd was scheming to sue Ocwen again, for the exact same conduct, in breach of the release and covenant not to sue he agreed to in return for receiving a significant portion of the settlement proceeds.

11.     After he sued, and then settled, with his own co-counsel over his share of the attorneys' fees he would receive from the Fisher Settlement, and still dissatisfied with his portion, Boyd initiated litigation against the trustees and/or master servicers of residential mortgage-backed securitization ("RMBS") trusts that included loans that Ocwen serviced, knowing that his claims were, in essence, being made against Ocwen because it was likely the trusts would seek indemnity from Ocwen relating to those claims.  Boyd knew that this new lawsuit would require litigation of the very same conduct as to which Ocwen paid to obtain a release in *Fisher*.

12.     Boyd then teamed up with Eichner, an Ocwen employee scheduled to be laid off, to initiate new litigation directly against Ocwen over the very same alleged conduct Ocwen already settled.  But like Boyd, Eichner too had already released his claims against Ocwen and entered into a covenant not to sue, in return for which Ocwen paid him $130,000 as part of a severance package.  Also like Boyd, even as Eichner accepted $130,000 in severance, Eichner was already making plans to sue Ocwen for his personal gain, even before he signed his release and accepted his severance payment.  Ocwen files this lawsuit to hold defendants liable for their misconduct.

### A.    The Fisher Litigation and Settlement

13.    Boyd is a Texas attorney who has made a practice of suing defendants under the FCA for allegedly defrauding the United States government.  In his numerous FCA cases, Boyd represents individuals as *qui tam* relators who seek to pursue claims on behalf of the government.  The United States is the real-party-in-interest in those FCA cases.  *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930, 934-35 (2009).  The relators who Boyd represents sue based on a limited assignment of the United States' claims for relief.  *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000).  Relators and Boyd seek to share in the United States' recovery in exchange for their pursuit of FCA claims on behalf of the government.  31 U.S.C. §3730(d).  Boyd has targeted Ocwen as a defendant in several FCA cases he filed.

14.    In 2012, acting on behalf of relator Michael J. Fisher, Boyd filed his first two lawsuits against Ocwen and its predecessors in the U.S. District Court for the Eastern District of Texas, Sherman Division.  *See* Case No. 4:12-cv-543, *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC and Ocwen Financial Corp.*, (E.D. Tex.); Case No. 4:12-cv-461, *United States ex rel. Fisher v. Homeward Residential, Inc.*, (E.D. Tex.).  Those two cases will be collectively referred to herein as "*Fisher*" (or as Boyd often refers to them "Ocwen I") because, although they were not formally consolidated, the two cases were resolved simultaneously through the same settlement and dismissal documents.  Fisher and Boyd have similarly teamed up to file several other FCA cases targeting other mortgage servicers and banking institutions.

15.    In *Fisher*, Boyd alleged that Ocwen defrauded the United States government by making false certifications and statements to the government to participate in and receive incentive payments under the Home Affordable Mortgage Program ("HAMP").  Boyd alleged that these false certifications and statements began in 2009.  Ocwen denied all liability in *Fisher* and

defended the litigation on the merits for more than three years, before finally reaching a settlement in 2017 under which Ocwen paid $30 million to fully and finally buy peace. During the lawsuit, Ocwen incurred more than $45 million in fees, expenses, and costs to defend itself in addition to the settlement payment.

16.     During the *Fisher* litigation, additional counsel appeared on behalf of Fisher. Moreover, Brian Bullock joined as an additional relator, also represented by Boyd. At some point, there was a falling out between Fisher and Boyd. However, Boyd continued to represent Bullock through the end of *Fisher*, and he continued to pursue a share of the recovery, including his attorney fees.

17.     In mid-2016, Relators Fisher and Bullock reached an agreement in principle with Ocwen to settle the *Fisher* case in return for a $30 million payment from Ocwen. Of that amount, $15 million was paid to the United States, and $15 million was set aside for Relators and their counsel, including Boyd.

18.     The parties memorialized that agreement in a written settlement agreement in February 2017. The United States agreed to that settlement, accepted $15 million from Ocwen, and consented to the dismissal **with prejudice** of the United States' FCA claims for the "Covered Conduct." The agreement defined "Covered Conduct" to refer to the *Fisher* allegations, including that Ocwen allegedly violated the FCA by "knowingly submitting or causing the submission of false or fraudulent claims in violation of the False Claims Act … arising from its performance of the Home Affordable Modification Program (HAMP) mortgage modifications, from April 16, 2009 through the Effective Date of this Agreement." Settlement at 2, ¶C, which is attached hereto as Exhibit A. Other examples of Covered Conduct stated in the release include allegations that Ocwen:

- "submitted false certifications in their Commitment to Purchase Financial Instrument and Servicer Participation Agreement, as subsequently amended, and annual HAMP certifications that they were in compliance with Truth in Lending Act, 15 U.S.C. § 1601 et seq, the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., and the Fair Housing Act 42 U.S.C. §3601 et seq."

- "knowingly submitting or causing the submission of false or fraudulent claims in violation of the False Claims Act by submitting false certifications in their Commitment to Purchase Financial Instrument and Servicer Participation Agreement, as subsequently amended, and annual HAMP certifications that they were in compliance with the National Housing Act 12 U.S.C. § 1701 et seq. and Federal Housing Administration ("FHA") regulations, from February 10, 2010 through the Effective Date of this Agreement." "failed to engage in loss mitigation in a timely manner, failed to engage in loss mitigation procedures, failed to implement an FHA-compliant quality control program, and improperly serviced FHA loans offshore."

Settlement at p.2-3, ¶C. The "Effective Date" for the Settlement was February 17, 2017.

19.     The release from Relators and their counsel, who were merely acting in a representative capacity on behalf of the United States, gave an even broader release to Ocwen, in return for which Relators and their counsel each received millions from the settlement. More importantly, for present purposes, they provided a covenant not to sue Ocwen again for the Covered Conduct:

> Relators, for themselves and their heirs, successors, attorneys, agents, and assigns, … (ii) covenant and agree not to initiate against Ocwen or any of its current and former directors, officers, agents, employees, parent corporations, predecessor and successor corporations, divisions, direct and indirect subsidiaries, and any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with [Ocwen], any legal, equitable, or arbitration proceeding in any nature based in any way on the Covered Conduct[.]

Settlement at ¶5. This covenant not to sue was a material part of the benefit that induced Ocwen to agree to the Settlement. Without this covenant, Ocwen would not have agreed to settle *Fisher*,

because, without a true end to that litigation and its attendant costs, a settlement would be practically meaningless.

     **B.**     *Boyd Took Money Through the Settlement But Failed to Honor Its Terms*

     20.     Boyd is bound by the *Fisher* settlement because he helped negotiate its terms, he accepted benefits under it, and the signatories signed the agreement on behalf of relators' attorneys, including Boyd. Indeed, Boyd asserted an attorneys' fee lien against Relators' recovery in that case on December 13, 2016, even before the settlement agreement was signed. *See* Docket Entry 547 in *Fisher*. After Ocwen funded the settlement, Boyd demanded to share in the recovery from *Fisher*. He even engaged in a contentious dispute in open court with his co-counsel demanding a greater share of the recovery than co-counsel believed was originally warranted. Although Ocwen is not yet aware of the amount Boyd received from Ocwen's *Fisher* settlement, there is no question that Boyd shared in that recovery and is bound by the terms of the settlement.

     21.     Boyd nevertheless publicly aired his complaints with the amount of the *Fisher* settlement as early as June 2016, even before the settlement was final. Boyd told reporters that the settlement was a "huge blow for taxpayers" and a "huge win for Ocwen." Boyd said that the United States settled for a "miniscule sum of money" and that Ocwen "escaped being held accountable."

     22.     Despite his public complaints about the *Fisher* settlement, Boyd never objected to the settlement nor its terms. He also never argued to the court that the settlement was unfair to the United States or the other parties or counsel in *Fisher*.

     23.     Unbeknownst to Ocwen and not disclosed by Boyd, before the ink was even dry on the Fisher Settlement, Boyd was already preparing to take a second bite at the apple and seeking more money based on Ocwen's Covered Conduct that was settled, released, and dismissed with

prejudice in *Fisher*. His first action was to file suit against U.S. Bank, N.A., Deutsche Bank National Trust Company, J.P. Morgan Chase Bank, N.A., and Wells Fargo Bank N.A. (collectively, "Trustee Defendants") in their roles as trustees and/or master servicers of trusts that included loans that were serviced by Ocwen. *See* Case No. 4:17-cv-00149-ALM*, United States ex rel. Loyd v. U.S. Bank*, in the U.S. District Court for the Eastern District of Texas, Sherman Division (the "*Loyd* Case"). He did not allege any direct claims of wrongdoing against the Trustee Defendants. Instead, Boyd alleged that the Trustee Defendants were vicariously liable for Ocwen's conduct.

24.     Boyd filed the *Loyd* Case on March 1, 2017, just two weeks after the *Fisher* settlement was signed, but before Ocwen funded the *Fisher* settlement. However, as required by the FCA, Boyd made disclosures to the United States regarding his allegations starting in June 2016. *See Loyd Complaint* at p. 97. And, Boyd filed the *Loyd* Case under seal under 31 U.S.C. §3730(b)(2), and it remained under seal until at least October 2019, when the *Loyd* Case was dismissed.

### C.     *Eichner Teamed Up with Boyd After He was Laid Off Even Though He Had Released All Claims Against Ocwen*

25.     Eichner met Boyd during discovery in the *Fisher* case in 2016, when Eichner gave deposition testimony *on behalf* of Ocwen. Until his deposition, Eichner and Boyd had no prior relationship. Then, in January or early February 2019, Eichner was informed that his employment with Ocwen would be terminated effective in May 2019 because Ocwen had decided to close its Addison, Texas facility. After learning of the layoff, but while still employed by Ocwen , Eichner teamed up with Boyd to assist him with new FCA litigation against Ocwen.

26.     Although the public filings related to Boyd's dismissal of the *Loyd* Case made it appear as if the dispute was over, Boyd was not finished. On July 15, 2019, the same day he filed

a notice of voluntary dismissal in the *Loyd* Case on behalf of Loyd, Boyd and Eichner filed the "*Eichner* Case" under seal. Case No. 4:19-cv-00524-ALM, *United States ex rel. Eichner v. Ocwen Loan Servicing, LLC*, in the U.S. District Court for the Eastern District of Texas, Sherman Division. In the *Eichner* Case, Boyd and Eichner filed direct claims against Ocwen for Covered Conduct that had been settled, released, and dismissed in *Fisher*. Boyd and Eichner also sued U.S. Bank National Association, Deutsche Bank National Trust Company, The Bank of New York Mellon Trust Company, N.A., The Bank of New York Mellon, The Bank of New York Mellon Corporation, and Wells Fargo Bank, N.A., all in their alleged capacities as trustees on behalf of certain RMBS trust defendants (collectively, "Trust Defendants") for Ocwen's conduct under a vicarious liability theory.

27.     But prior to Eichner filing the *Eichner* Case, Ocwen paid Eichner $130,000 in return for Eichner's agreeing to the terms, representations, and releases in the Separation Agreement. *See* Separation Agreement at ¶2. Ocwen would not have agreed to pay Eichner that money without the return consideration Eichner promised in the Separation Agreement.

28.     In the Separation Agreement, Eichner represented as follows:

(iv) Individual [Eichner] has had the opportunity to provide the Company with written notice of any and all concerns regarding suspected ethical and compliance issues or violations on the part of the Company or any other Released Parties; and

(v) Individual has reported any pending judicial or administrative complaints, claims, or actions filed against the Company or any other Released Parties.

Separation Agreement at ¶1. Neither before nor after signing the Separation Agreement did Eichner make any reports or disclosures to Ocwen as described in these provisions.

29.     Eichner also agreed to a full and final release of claims against Ocwen:

3.     <u>Full and Final Release</u>. In consideration of benefits provided by the Company … Individual [Eichner] … fully, finally, and forever releases and discharges the Company and its affiliates, as well as their respective successors, assigns, officers, owners, directors, agents, representatives, attorneys, and

employees (all of whom are referred to throughout this Agreement as the "Released Parties"), of and from all claims, demands, actions, causes of action, suits, damages, losses, and expenses, of any and every nature whatsoever, individually or as part of a group action, known or unknown, as a result of actions or omissions occurring through the date Individual signs this Agreement.

Separation Agreement at ¶3. The Separation Agreement confirmed that Eichner understood that this release is (and was intended to be) very broad: "Individual is, through this Agreement and the general release provided herein, releasing the Released Parties from any and all claims Individual may have against the Company or such individuals." *Id.* at ¶5(iv). Following the Separation Agreement, Eichner could not pursue any claims for recovery paid by Ocwen:

[B]y signing this Agreement Individual is waiving rights to individual relief … in any charge, complaint, or lawsuit or other proceeding brought by Individual or on Individual's behalf by any third party, except for any right Individual may have to receive a payment from a Government agency (and not the Company) for information provided to the government agency.

*Id.* at ¶6.

30.     But if there was any doubt on this point (which there was not), Eichner signed the Separation Agreement following a statement in all caps as follows:

THE PARTIES HAVE READ AND FULLY CONSIDERED THIS AGREEMENT AND GENERAL RELEASE AND ARE MUTUALLY DESIROUS OF ENTERING INTO SUCH AGREEMENT AND GENERAL RELEASE.

INDIVIDUAL UNDERSTANDS THAT THIS DOCUMENT SETTLES, BARS, AND WAIVES ANY AND ALL CLAIMS INDIVIDUAL HAD OR MIGHT HAVE HAD AGAINST OCWEN UP THROUGH THE SETTLEMENT DATE OF THIS RELEASE.

Separation Agreement at p. 8. The Settlement Date was May 23, 2019, which was the date Eichner signed the Separation Agreement.

31.     In addition to the release, Eichner also agreed not to take certain actions that would be adverse to Ocwen's business interests, including:

10.  <u>Post-Employment Restrictions</u>. Individual agrees that he will not:  (i) for a period of (2) years following the date of this Agreement take any action that would interfere with, diminish or impair the valuable relationships that the Company has with its clients, customers and others with which the Company has business relationships or to which services are rendered[.]

12.  <u>Non-Disparagement</u>.  Individual agrees not to make statements to clients, customers and suppliers of the Released Parties or to other members of the public that are in any way disparaging or negative towards the Released Parties or their products and services.

Separation Agreement at ¶¶10, 12.  Read in light of the release language and representations in the Separation Agreement, these provisions confirmed and reinforced Eichner's representations and promises to Ocwen that Ocwen was to receive complete peace from Eichner in return for the separation payment.  There are no provisions in the Separation Agreement or in the parties' discussions and negotiations leading up to it that provided any notice or warning to Ocwen that Eichner was working to stir up new litigation against Ocwen.

32.  Ocwen advised Eichner to consult a lawyer regarding the Separation Agreement prior to signing it or agreeing to the releases contained therein.  Separation Agreement at ¶5(viii) ("The Company advises Individual to consult with an attorney prior to signing this Agreement.").  The Separation Agreement further provided:  "Individual is hereby advised in writing to consider the terms of this Agreement and the general release provided herein and consult with an attorney of Individual's choice prior to signing this Agreement."  *Id.* at ¶5(v).  *See also id.* at ¶16 ("Both parties acknowledge that they have had the opportunity to freely consult, if they so desire, with the attorney of their own choosing prior to signing this document regarding the contents and consequences of this document.").  Not only did Ocwen provide the Separation Agreement to Eichner to review in advance of signing it, *see id.* at ¶5(ii) (providing for a 45-day review period), Eichner had a chance to review the agreement again after signing it on May 10, 2019, when he reviewed and signed a corrected agreement on May 23, 2019.  The Separation Agreement also

provided for a seven-day revocation period, *see id.* at ¶5(vi), which passed without any rejection or revocation by Eichner.  Thus, Eichner had ample opportunity to consult with a lawyer regarding the Separation Agreement prior to executing it and being bound by its terms.

33.     The Separation Agreement also provided that a breach of the Separation Agreement would subject Eichner to "an action to obtain reimbursement of all monies paid pursuant to Paragraph 2 of the Agreement."  Separation Agreement at ¶14.  The Separation Agreement expressly authorizes Ocwen to sue based on "[v]iolation of any provision of this Agreement by Individual."  *Id.*

**D.     With Boyd's Assistance, Eichner Sued Ocwen In Violation of the Separation Agreement**

34.     On Friday, June 14, 2019, Eichner accepted payment of the $130,000 severance amount from Ocwen.  Yet notwithstanding the clear language of the Separation Agreement, Eichner breached that agreement with Boyd's assistance by pursuing legal action for his own benefit against Ocwen and interfering with Ocwen's business relationships.  Worse, Eichner had already started taking action contrary to the Separation Agreement even before he signed it, making his promises and representations to Ocwen false when made and demonstrating that Eichner had no intent to comply with his promises and representations.

35.     More specifically, beginning on or about February 1, 2019, Eichner coordinated with Boyd to pursue litigation against Ocwen and the Trust Defendants.  Eichner and Boyd filed suit under seal against Ocwen on July 15, 2019, on their own behalf and on behalf of the United States, initiating Case No. 4:19-cv-00514-ALM, in the U.S. District Court for the Eastern District of Texas, Sherman Division (the "*Eichner Case*"), attempting to invoke the *qui tam* provisions of 31 U.S.C. §3730.  Thus, Eichner filed suit only one month after accepting the $130,000 severance payment from Ocwen.

36.     Eichner expressly sued Ocwen in his "individual capacity."  In that suit, Eichner accuses Ocwen of defrauding the federal government and by engaging in various acts of misconduct when servicing borrower loans.  Eichner also seeks to hold the Trust Defendants liable for Ocwen's conduct solely on the basis of a vicarious liability theory.  Eichner's suit disparages Ocwen and interferes with Ocwen's business relationships, in violation of Eichner's promises in the Separation Agreement.

37.     By May 10, 2019 (the date of the Separation Agreement), Eichner had already provided disclosures of "substantially all information [he] possessed" to the United States, as a prerequisite for initiating False Claims Act litigation against Ocwen.  31 U.S.C. §3730(b)(2).  Thereafter, he continued working with Boyd on a complaint to be filed against Ocwen to initiate suit.  At the time Eichner agreed to release all of his claims against Ocwen in the Separation Agreement, Eichner had actual knowledge and intent to pursue new litigation against Ocwen for his own personal gain.  Thus, at the time he signed the Separation Agreement, Eichner did not intend to honor his promises to Ocwen.  He also failed to disclose material facts to Ocwen that confirmed that his representations to Ocwen were false when made.

38.     Ocwen did not learn about Eichner's conduct in breach of the Separation Agreement and his false representations and omissions until after the *Eichner Case* was unsealed in December 2021.  Shortly thereafter, Ocwen confronted Eichner's lawyers about their conduct.  Eichner's only excuse for taking the actions he did was to claim "he needed the money."  But Eichner's professed need for money is no excuse for lying to Ocwen to induce Ocwen to pay him nor for breaching the Separation Agreement.

39.     Ocwen has already incurred and continues to incur substantial amounts in fees and costs defending itself against Boyd's and Eichner's accusations, all of which were incurred as a

direct result of Boyd's breach of the covenant not to sue from *Fisher* and Eichner's breach of the Separation Agreement.  These damages continue to accrue as Boyd and Eichner continue to pursue litigation against Ocwen for conduct that was already settled, released, and dismissed.

## VI.  CAUSES OF ACTION

**A.**     ***Breach of the Fisher Settlement and Covenant Not to Sue***

40.     Ocwen incorporates all of the foregoing paragraphs.

41.     The *Fisher* settlement is a binding contract that binds Boyd.  The covenant not to sue over Ocwen's Covered Conduct in Paragraph 5 of the *Fisher* settlement is also binding on Boyd.  Under its express terms, it binds Relators' attorneys, which covers Boyd.  Boyd also accepted and retained benefits under the settlement when he received a portion of Ocwen's settlement payment.

42.     Boyd breached the covenant not to sue when he filed the *Eichner* Case directly against Ocwen seeking to recover more funds from Ocwen relating to the Covered Conduct that was settled, released, and dismissed with prejudice in *Fisher*.

43.     Boyd also breached the covenant not to sue when he filed both the *Loyd* and *Eichner* Cases, arguing that additional defendants were vicariously liable for Ocwen's Covered Conduct. "Control" is a key element to prove vicarious liability.  *See Indian Harbor Ins. Co. v. Valley Forge Ins. Group*, 535 F.3d 359, 364 (5th Cir. 2008).  And under the *Fisher* settlement, Relators and their counsel covenanted and agreed that they would not sue "any person or entity that directly, or indirectly through one or more intermediaries, controls" Ocwen.  Settlement at ¶5.  Accordingly, under the plain language of the *Fisher* settlement, Boyd covenanted not to make the very allegations and assert the very claims that he did in the *Loyd* and *Eichner* Cases.

44.     Ocwen has suffered and continues to suffer damage as Boyd continues to pursue litigation against Ocwen.  Moreover, Ocwen is at risk of facing additional damages if the trustee defendants seek indemnity against Ocwen.  The settlement agreement was drafted in a way to ensure that, when Ocwen paid $30 million, the FCA claims over the Covered Conduct were over. Boyd's actions in breach of the covenant not to sue are depriving Ocwen of the benefit of its bargain.

45.     Ocwen further seeks recovery of its reasonable and necessary attorneys' fees and costs under Texas Civil Practice & Remedies Code §38.001.

**B.      *Tortious Interference with the Fisher Settlement***

46.     Ocwen incorporates all of the foregoing paragraphs.

47.     In the alternative, if Boyd denies that he is bound by the *Fisher* settlement, Boyd is liable for tortiously interfering with the *Fisher* settlement.  Ocwen has an actual, existing agreement with the United States for the settlement of the Covered Conduct in *Fisher*.  Boyd knows about the settlement and its terms given that he participated in the negotiations over its terms and has accepted benefits under that settlement.  By filing the *Loyd* and *Eichner* Cases, Boyd is actually interfering with the settlement, thereby knowingly and intentionally depriving Ocwen of the benefit of its bargain under the *Fisher* settlement.

48.     Boyd's acts of interference are the actual and proximate cause of Ocwen suffering damages.  Moreover, Boyd should be held liable for exemplary damages because his acts of interference were committed with malice, fraud, and gross negligence.

49.     "Malice" is defined as a "specific intent by the defendant to cause substantial harm to the claimant."  Tex. Civ. Prac. & Rem. Code §41.001(7).  Boyd's malice is demonstrated by his

public comments complaining about the *Fisher* settlement and in his private comments to Ocwen when he served notice of the *Eichner* Case, in which he wrote:

> This email is intended to initiate communications in the above-captioned litigation, as is my practice, with an invitation to explore ADR options. You may recall that in the "Fisher" False Claims Act ("FCA") lawsuits we prosecuted claims against Ocwen and its subsidiary AHMSI ("***Ocwen I***"). Ocwen announced in its July 27, 2016 earnings call that it spent $44 million defending our cases (for claims similar to those asserted here) through the date of the $30 million settlement on the eve of the June 2016 trial setting. ***Even so, the de minimus $30 million settlement was negotiated by Ocwen directly with the DOJ based upon an alleged "inability to pay" claim made by Ocwen. We see no opening for such a repeat defensive maneuver in this case.***
>
> As we demonstrated in Ocwen I, we are not reluctant to try big cases. However, FCA litigation is business, not personal, and we remain open to settlement discussions, as history has taught us that the costs for all parties will soon increase, perhaps exponentially, as the litigation proceeds.

Thus, Boyd has shown a specific intent to cause significant harm to Ocwen by pursuing what he apparently calls the "Ocwen II" FCA Case – *i.e.*, his second bite at the same apple. That is, he is intentionally suing Ocwen for conduct that was settled and resolved in "Ocwen I," with the intent of making Ocwen incur additional damages to settle with Boyd through "ADR options" or through litigation because "as history has taught us that that costs for all parties will soon increase, perhaps exponentially, as the litigation proceeds."

50.     Moreover, exemplary damages are warranted due to Boyd's acts of fraud, which are explained in the next cause of action below.

### C.     Fraudulent Inducement of the Fisher Settlement

51.     Ocwen incorporates all of the foregoing paragraphs.

52.     Boyd made false statements of material fact and failed to disclose material facts when he knowingly approved and accepted benefits under the *Fisher* settlement while he was simultaneously planning to file a new lawsuit based on Ocwen's Covered Conduct that was covered by the *Fisher* release and covenant not to sue. At a minimum, Boyd's plan to file a new

suit under the FCA based on Ocwen's alleged conduct at the same time he was signing off on and accepting the benefits under the *Fisher* settlement, which included a dismissal with prejudice of the United States' FCA claims, created a false and misleading impression that Ocwen was ending all litigation over the Covered Conduct, which is what Ocwen was paying $30 million to do—to buy peace.

53.     Boyd knew his statements and omissions were false and misleading when made because he had already taken steps to sue once again based on Ocwen's Covered Conduct.  As his disclosure statement on page 97 of the *Loyd* Case Original Complaint shows, Boyd made disclosures to the United States regarding his new claims in June 2016, months before Boyd made his statements and omissions in the *Fisher* settlement.  He also provided the United States with a draft of his Complaint on February 21, 2017, just four days after the parties signed the settlement. He filed that Complaint on March 1, 2017, just two weeks after the *Fisher* settlement, and before Ocwen even funded the settlement.  Thus, Boyd made his statements and omissions before he accepted his portion of the settlement proceeds.

54.     Boyd's statements and omissions were material because they induced Ocwen to settle *Fisher* and to pay the agreed-upon $30 million settlement based on the false and misleading understanding that Ocwen was ending the FCA litigation over the Covered Conduct.  Had Ocwen known what Boyd was doing, Ocwen would not have agreed to pay $30 million to settle *Fisher*. Instead, Ocwen was paying $30 million to forever settle and resolve the United States' claims over the Covered Conduct.  Every dollar that Ocwen spends defending against Boyd's new litigation is depriving Ocwen of the benefit of its bargain.

55.     Ocwen is not seeking to set aside the *Fisher* settlement.  Indeed, Ocwen hereby elects to keep the settlement, release, and dismissal with prejudice of the United States' claims in

place, as it has the right to elect to do.  Ocwen is suing Boyd for disgorgement of all funds he received under the settlement, as well as all of its reliance damages.

56.     Because Ocwen's damages are the result of Boyd's fraudulent representations and omissions, Ocwen also seeks recovery of exemplary damages.  Boyd's acts were also malicious.

### D.     Breach of the Separation Agreement

57.     Ocwen incorporates all of the foregoing paragraphs.

58.     The Separation Agreement is a binding contract.  In the Separation Agreement, Eichner promised that he would not pursue claims against Ocwen based on pre-May 10, 2019 conduct.  Eichner further agreed that he would not take action to disparage Ocwen or to interfere with Ocwen's business relationships.  Eichner breached the Separation Agreement by suing Ocwen for pre-May 10, 2019 conduct.

59.     Eichner expressly agreed not to sue Ocwen for the claims he released, such as the *qui tam* claims he is now trying to pursue against Ocwen:

> 4.     <u>Agreement Not to Sue</u>.  Other than an action for breach of the Release Agreement or as otherwise provided in paragraphs 6 and 7, Individual expressly acknowledges that if Individual files any claim or lawsuit, or causes or aids any claim or arbitration to be filed on Individual's behalf, regarding any matter described in the Release Agreement, Employer may be entitled to recover from Individual some or all money paid under this Release Agreement, plus attorneys' fees and costs incurred in defending against such action, to the extent permitted by law.

Separation Agreement at ¶4.  The lawsuit Eichner filed does not qualify for any of the exceptions to this covenant.  He did not sue to enforce the Separation Agreement.  His lawsuit against Ocwen is not an action under the Defend Trade Secrets Act covered by Paragraph 7.  And although Paragraph 6 preserved some rights for Eichner to file complaints with the government or to cooperate with law enforcement, it did not allow *Eichner* to file a lawsuit seeking monetary recovery for himself.

60. Paragraph 6 provides in relevant part:

> Nothing in this Agreement, including but not limited to the acknowledgements, release of claims, proprietary information, confidentiality, cooperation, and non-disparagement provisions … (ii) prevents Individual <u>from filing a charge or complaint with or from participating in an investigation or proceeding conducted by</u> the Equal Employment Opportunity Commission, the Occupation Safety and Health Administration, National Labor Relations Board, the Securities and Exchange Commission, or <u>any other federal, state, or local agency charged with the enforcement of any laws</u> …

Separation Agreement at ¶6 (emphasis added). To be clear, nothing in the Separation Agreement prohibited Eichner "from filing a charge or complaint with … [the] federal … agency charged with the enforcement of any law" such as the False Claims Act (*i.e.* the Department of Justice ("DOJ"). Moreover, Eichner had the right to "participat[e] in an investigation or proceeding conducted by … [the] federal … agency charged with the enforcement of any law" such as the DOJ. But he is doing neither. Eichner could not file a complaint on his own behalf with a Court seeking to represent and recover as a *qui tam* relator against Ocwen. Such a *qui tam* case filed with the Court is not a "charge or complaint" filed with the DOJ, nor is it "an investigation or proceeding conducted by" the DOJ. Paragraph 6 finishes by reconfirming that Eichner gave up his rights to any individual recovery, such as he is trying to claim as a *qui tam* relator. Thus, he filed his *qui tam* complaint in violation of the covenant not to sue.

61. Ocwen has suffered damage as a result of Eichner's breaches. Moreover, under Paragraph 14 of the Separation Agreement, Ocwen has the right to demand reimbursement from Eichner for the monetary consideration Ocwen paid to Eichner for the releases, representations, and consideration that Eichner breached.

62. Ocwen continues to suffer damage as a result of Eichner's continuing conduct in violation of the Separation Agreement. Ocwen seeks recovery of all of its actual damages,

including its attorneys' fees and costs incurred in defending against the *Eichner Case*. Separation Agreement at ¶4.

63.     Ocwen further seeks recovery of its reasonable and necessary attorneys' fees and costs under Texas Civil Practice & Remedies Code §38.001.

**E.      Fraud in the Inducement of the Separation Agreement**

64.     Ocwen incorporates all of the foregoing paragraphs.

65.     Eichner made false statements of material fact and failed to disclose material facts when he knowingly approved and accepted benefits under the Separation Agreement while he was simultaneously planning to sue Ocwen.

66.     At a minimum, Eichner's plan to sue Ocwen at the same time he was signing off on and accepting the benefits under the Separation Agreement, created a false and misleading impression that Ocwen was resolving any and all disputes with Eichner. Eichner had a duty to correct the false and misleading impressions created by Eichner's omissions.

67.     Eichner knew his statements and omissions were false and misleading when made because he had already taken steps to sue Ocwen.

68.     Eichner's statements and omissions were material because they induced Ocwen to pay $130,000 to Eichner based on the false and misleading understanding that Ocwen was resolving any and all potential issues it had with Eichner. Had Ocwen known the truth, Ocwen would not have agreed to pay $130,000 to Eichner.

69.     Ocwen is suing Eichner for recovery of the damages Ocwen suffered when it acted in reliance on Eichner's false statements and omissions.

70.     Because Ocwen's damages are the result of Eichner's fraudulent representations and omissions, Ocwen also seeks recovery of exemplary damages.

## VII.  CONDITIONS PRECEDENT

71.     All conditions precedent to Ocwen's claims for relief have been performed or have occurred.

## VIII.  PRAYER

WHEREFORE, PREMISES CONSIDERED, Ocwen prays that Boyd and Eichner will be cited and served to appear in this matter and that the Court will render a final judgment in this matter:

a.     holding Boyd liable for breach of contract, tortious interference, and/or fraudulent inducement;

b.     holding Eichner liable for breach of contract and/or fraudulent inducement;

c.     awarding Ocwen recovery of all of its actual damages;

d.     awarding Ocwen recovery of exemplary damages;

e.     awarding Ocwen recovery of pre-judgment and post-judgment;

f.     awarding Ocwen recovery of its attorneys' fees and court costs; and

g.     awarding Ocwen such other and further relief to which it is entitled.

Respectfully submitted,

/s/ Robert T. Mowrey
Robert T. Mowrey
  Texas Bar No. 14607500
  rmowrey@lockelord.com
W. Scott Hastings
  Texas Bar No. 24002241
  shastings@lockelord.com
C. Scott Jones
  Texas Bar No. 24012922
  sjones@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-6776
Telephone: (214) 740-8000
Facsimile:  (214) 740-8800

**ATTORNEYS FOR PLAINTIFFS OCWEN
FINANCIAL CORPORATION and PHH
MORTGAGE CORPORATION**